IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2022

## STATE OF TENNESSEE v. KIRSTEN JANINE WILLIAMS

**Appeal from the Circuit Court for Madison County**
**No. 20-443-B    Donald H. Allen, Judge**

_____

### No. W2021-01071-CCA-R3-CD

_____

The Defendant, Kirsten Janine Williams, was convicted by a jury of aggravated assault, aggravated kidnapping, and aggravated burglary. She received an effective 15-year sentence to be served at 100-percent. On appeal, the Defendant challenges the sufficiency of the evidence supporting her convictions, arguing that there was no proof she ever held a gun, that the victim was free to leave, and that she entered the victim's residence with consent. Following our review of the record and applicable authorities, we find the evidence sufficient to support the Defendant's convictions and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Justin P. Jones (on appeal), Brownsville, Tennessee; and Joshua L. Phillips (at trial), Jackson, Tennessee, for the Appellant, Kirsten Janine Williams.

Herbert H. Slatery III, Attorney General and Reporter; Hannah-Catherine Lackey, Assistant Attorney General; Jody S. Pickens, District Attorney General; Shaun A. Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

Melanie Page ("the victim") reported that on October 29, 2019, the Defendant and Ajia Hewlett entered her residence and assaulted her, threatened her with a weapon, and forced her to go to their side of the duplex where the beating continued. Thereafter, on June 29, 2020, a Madison County grand jury indicted the Defendant for aggravated assault,

aggravated kidnapping, aggravated burglary, tampering with evidence, and being a convicted felon in possession of a handgun. *See* Tenn. Code Ann. §§ 39-11-106, -13-102, -13-304, -14-403, -16-503. Ms. Hewlett was also charged for her alleged participation, and the two women were tried jointly by a jury on May 11, 2021.

At trial, the State presented the following evidence. The victim testified that in October 2019, she was living with Ms. Janie Arthor on the right side of a duplex on Greenwood Street in Jackson and that she had been living there for approximately six months. The victim stated that she moved into the duplex in order to help care for Ms. Arthor, who was paralyzed on her right side following a stroke. According to the victim, the Defendant lived next door on the left side of the duplex, along with codefendant Hewlett and a man, whom the victim knew only as "J-Rock."[1] The victim indicated that she and the Defendant had been friends for about six years at that time. The victim indicated that codefendant Hewlett was dating Mr. Stewart, that codefendant Hewlett had recently moved into the duplex, and that she had only met codefendant Hewlett a day or two prior to this incident.

According to the victim, around 3:00 a.m. on the morning of October 29, 2019, she was awake in her bed watching television, when the Defendant called her and said "that she needed to talk," though the victim had been over at the Defendant's visiting the day before. The victim indicated that Ms. Arthor was in the hospital, so she was home by herself when the Defendant called. Because they were friends, the victim told the Defendant that she had "left [her] door unlocked" and gave the Defendant permission to enter.

The victim testified that shortly after the phone call, the Defendant entered her bedroom accompanied by codefendant Hewlett. The Defendant grabbed the house phone that was sitting next to the victim on the bed and put it in her pocket. The victim said, "That's when I pretty much knew something was up." According to the victim, the Defendant demanded that the victim "tell her the truth," but the victim did not know what the Defendant was talking about. The Defendant accused the victim of writing a "statement to the police about [the Defendant] and the man that stayed in [the Defendant's] apartment." When the victim persisted in her denial, the Defendant and codefendant Hewlett began hitting the victim in the head with their fists. The victim said that the Defendant "busted [her] nose open" when the Defendant hit her in the face with a ring on the Defendant's hand, which caused the victim to bleed.

---

[1] Although the victim only knew this man as "J-Rock," codefendant Hewlett later identified him as her fiancé Jason Stewart, or "J-Rod." For clarity and ease of reference, we will refer to him as Mr. Stewart.

According to the victim, they pulled her onto the floor and started "kicking and stomping on [her] head." The victim indicated that the Defendant went into her bathroom and filled the bathtub with water and that the Defendant told the victim that she was going to put the victim "in the water" if the victim did not tell the truth. Next, Mr. Stewart entered the victim's side of the duplex. The victim stated that Mr. Stewart was holding a "black gun" in his hand, though he did not point it directly at her. The Defendant, despite never holding the gun, told the victim "that if [she] tried to run that they would shoot [her]." The victim said that she feared for her life.

The victim testified that she was lying on the bedroom floor with her head "throbbing" when the group started walking towards the victim's front door. The victim thought they were going to leave, but the Defendant turned around and came back to the bedroom. According to the victim, the Defendant then "jerked [the victim] up off the ground" by her arm, forcing her to get up, and "pull[ed]" the victim over to the Defendant's side of the duplex. When they got to the Defendant's side of the duplex, which the victim estimated was around 3:30 or 4:00 a.m., the Defendant continued to hit the victim in the head and ordered the victim to clean a spare bedroom. The victim said that she cleaned the entire bedroom, which was "real nasty," for approximately 30 to 45 minutes, including moving furniture and other items around, sweeping and mopping, and cleaning out the closet. The Defendant sat in a chair in the bedroom and watched as the victim cleaned.

The victim said that the Defendant told her that she was going to clean their house and that "they were going to teach [her] not to talk anymore." The victim indicated that during this time, Mr. Stewart sat in the living room with another woman, and though she never saw the gun once inside the Defendant's residence, she still feared what would happen if she disobeyed the Defendant.

Later, the Defendant instructed the victim to "strip down butt naked in front of everybody in the house" because the victim's clothes were bloody. The Defendant then ordered the victim to wash the dishes in the kitchen, and while the victim was washing the dishes, Defendant hit the victim's back with a heating pad cord. After doing the dishes, which took about 20 to 30 minutes, the Defendant made the victim take a shower "to wash the blood off of [herself.]" The Defendant also took away the victim's clothes and made the victim put on some of the Defendant's clothes after the shower. According to the victim, the Defendant answered a phone call and left the residence for a few minutes.

The victim testified that after the Defendant left the residence, codefendant Hewlett was sitting alone in the living room. The victim went into the living room and asked codefendant Hewlett for a cigarette, which she provided. The victim then returned to the kitchen and sat at the table. The victim said that she waited and listened to codefendant Hewlett's movements. When codefendant Hewlett did not get up from the living room and

come into the kitchen, the victim escaped through the kitchen's back door. The victim estimated that the Defendant had been gone for about five minutes at this point and that it was around 3:00 or 4:00 p.m. The victim said that after she escaped from the Defendant's residence, she ran across the street to a neighbor's house and phoned 9-1-1.

The victim estimated that she was inside the Defendant's side of the duplex for about 11 or 12 hours in total. In addition, the victim testified that the Defendant took her house phone and her makeup bag from the victim's residence without her permission.

The victim did not know that codefendant Hewlett would be accompanying the Defendant or that they intended to assault her once inside the victim's side of the duplex. The victim indicated that had she known their intentions, she would not have allowed them to come inside and assault her. The victim said that she was terrified, scared of the gun, and did not feel free to leave the Defendant's residence fearing that she would be shot and killed.

The victim confirmed that she was taken to the hospital where she received treatment for her injuries for approximately four to five hours. According to the victim, she had "a bone chipped off on [her] nose" from where the Defendant had hit her with the Defendant's ring. The victim described her face as being "unrecognizable" due to her injuries, and she said that she still had a scar on her nose from where the Defendant hit her. In addition, the victim testified that she suffered hairline fractures "in almost all of the bones in the top of [her] hands" and that she had marks on her back from where the Defendant "whipped" her with the heating pad cord.

The victim confirmed that the police photographed her injuries while she was in the hospital. Those photographs were entered into evidence. The victim described the photographs, stating that they showed her eye was swollen and black, that her mouth was swollen and bloody, that she had a cut on her nose, that her hands were black and blue from "trying to block the hits," that there was a cut on her hand from one of the women's shoes, that she had scratching and bruising on her arms, and that there were "whip marks" on her back.

The victim testified that she told the police what had happened both on the scene and again later at the hospital. The victim acknowledged that she had used drugs in the early afternoon hours of October 28, smoking marijuana and using crack cocaine. According to the victim, she and the Defendant smoked marijuana together on the afternoon of October 28. In addition, the victim testified that the Defendant injected "some kind of drug" into her neck a couple of times while she was being held in the Defendant's residence on October 29, though the drug did not make the victim feel any different.

The victim confirmed that she gave a written statement to the police while being treated at the hospital. However, in the police statement, the victim said that the Defendant called her around 6:00 a.m. rather than 3:00 a.m. The victim explained that she was uncertain of the exact time, but she knew the incident began when it was still dark outside. In addition, there was nothing contained in the victim's police statement about her bathtub's being filled with water or the Defendant's injecting her with a substance.

The victim confirmed that the police photographed the Defendant's side of the duplex. These photographs were entered into evidence. A set of photographs showed the spare bedroom that the victim had cleaned. Another photograph reflected the clean dishes in the Defendant's kitchen. Two additional photographs showed the victim's bloody clothing that was found inside the Defendant's residence.

Officer Josh Michael with the Jackson Police Department ("JPD") testified that around 3:00 p.m. on October 29, 2019, he responded to the victim's 9-1-1 call from her neighbor's residence. Officer Michael said that he observed the victim's visible injuries, stating that "both her eyes were pretty swollen and she had a cut on her upper lip." According to Officer Michael, the victim identified the Defendant and codefendant Hewlett as being the persons responsible for her injuries. Officer Michael said that the victim acted as if she had been assaulted. He could not tell if the Defendant was under the influence of drugs, and he did not recall the victim's ever telling him that she had been injected with any drugs during the incident.

JPD Officer Hannah Wright testified that on October 29, 2019, she waited with the Defendant and codefendant Hewlett while other officers gathered information. Subsequently, Officer Wright searched the Defendant's residence for evidence. On top of the dresser in the back bedroom of the residence, Officer Wright located several needles and a spoon with residue on it. Officer Wright recalled that only one bedroom in the Defendant's residence was clean and that the rest of the house was in disarray and was "[n]asty." In addition, Officer Wright found a heating pad sitting on top of the washing machine and a damp rag in the bathroom with a "red-like substance on it that [she] presumed to be blood[.]"

JPD Investigator Kyle Hamilton responded to the Greenwood Street duplex and processed the scene. He testified that the Defendant's side of the duplex was cluttered, that the only clean areas were one bedroom and around the kitchen sink, and that the dishes in the kitchen appeared to have been recently washed. Investigator Hamilton photographed and collected the rag seen in the bathroom that appeared to have blood on it, a loaded 9mm handgun found under the bed in the back bedroom, and a gray shirt and pair of pants from inside a pillowcase found in the kitchen that appeared to have blood on them as well. His photographs were entered as exhibits. Investigator Hamilton also saw and collected the

-5-

heating pad and a cordless Panasonic phone, though he did not find a corresponding phone base in the Defendant's residence.

From the victim's side of the duplex, Investigator Hamilton collected the victim's bed sheets, clothes from her room, a white comforter, white sheets, and a printed sheet. He noted what appeared to be blood on a pillowcase and a sheet. He also collected the base to the victim's Panasonic phone, though no corresponding phone was located in the victim's residence. Investigator Hamilton did not recall seeing any bathtub filled with water.

Following the Defendant's motion for judgment of acquittal, the charge against the Defendant for being a convicted felon in possession of handgun was dismissed. Thereafter, the Defendant did not present any proof on her own behalf. However, codefendant Hewlett presented one witness and testified herself.

JPD Investigator Joseph Williams testified that he took a written statement from the victim while she was at the hospital. Investigator Williams confirmed that the victim never told him that she had been injected in the neck with anything while inside the Defendant's residence or that the Defendant had filled a bathtub full of water and threatened to put the victim inside it. Investigator Williams said that had the victim told him about being injected with something, he would have requested blood tests to investigate further.

Twenty-year-old codefendant Hewlett testified that on the morning of October 29, 2019, the Defendant went over to the victim's side of the duplex for about an hour or so to talk with the victim before returning to their side of the duplex. Codefendant Hewlett had only known the victim for about a week. Codefendant Hewlett asserted that she asked the Defendant to borrow bug spray from the victim because they had a bug problem and did not have any bug spray in their house. Codefendant Hewlett said that while the Defendant was gone, the Defendant's young son woke up, so codefendant Hewlett took him over to the victim's residence where the Defendant was located. According to codefendant Hewlett, she knocked on the victim's door, and the Defendant answered. Codefendant Hewlett reminded the Defendant about the bug spray and told the Defendant that her son kept asking for her. The Defendant indicated that she had forgotten about the bug spray and asked the victim to borrow some, and the victim started looking for bug spray in the kitchen. Codefendant Hewlett did not think the victim sounded like she was distressed at that time.

Codefendant Hewlett testified that she stayed on the victim's side of the duplex until her fiancé, Mr. Stewart, came home and knocked on the victim's door. Codefendant Hewlett said that she and Mr. Stewart then returned to their side of the duplex. She never got any bug spray. According to codefendant Hewlett, the Defendant and the victim came over to their side of the duplex about 30 minutes later, which was between 6:00 and 8:00

a.m., and codefendant Hewlett did not observe any markings on the victim at that time. However, codefendant Hewlett later, around 11:00 a.m., saw the Defendant hit the victim when the victim came into the bathroom with a towel and stated that she had "missed a vein." The victim, after being hit, "fell to the wall and got back up."

Codefendant Hewlett testified that around 1:00 p.m., she heard a "pow-like sound" coming from the kitchen, though she never saw the victim getting hit or heard the victim cry for help. According to codefendant Hewlett, the Defendant and the victim stayed in the kitchen for the rest of the day.

Codefendant Hewlett asserted that the victim appeared to be intoxicated that day, noting that the victim was "nodding off" and "falling asleep" and that she was unable to walk properly. Codefendant Hewlett confirmed that the Defendant frequently used heroin and "ice" and that the Defendant often kept needles in her bedroom. Codefendant Hewlett asserted that on October 29, she witnessed the Defendant in the kitchen injecting heroin into the victim's feet.

Codefendant Hewlett indicated that the Defendant left the residence "about four times" during the day and that the victim could have left during any of those times. According to codefendant Hewlett, the last time the Defendant was absent from the residence, around 2:00 to 3:00 p.m., the victim came into the living room and asked where the Defendant was before asking codefendant Hewlett for a cigarette. Codefendant Hewlett gave the victim a cigarette and, shortly thereafter, told the victim to "go on and leave." Codefendant Hewlett confirmed that she gave a statement to Investigator Williams following these events.

On cross-examination, codefendant Hewlett admitted to telling Investigator Williams that the Defendant called the victim before going over to the victim's side of the duplex. She also claimed that she told Investigator Williams about going over to the victim's residence to get bug spray, though he did not include that information in her statement.

Codefendant Hewlett confirmed that she told Investigator Williams that the Defendant brought the victim over to their side of the duplex, that the victim was bleeding at that time, and that "[she] could tell that [the victim] had been beat up." Codefendant Hewlett explained that the victim only had a "random mark" on her nose at that time and that the Defendant was yelling about the victim's stealing Ms. Arthor's needle.

Additionally, codefendant Hewlett admitted to telling Investigator Williams that the Defendant "made [the victim] get naked and wash the dishes" and that the Defendant "was hitting [the victim] with an extension cord while she washed the dishes." Codefendant

Hewlett confirmed that the cord was on a heating pad, though she claimed she did not see the victim get hit with it. Codefendant Hewlett acknowledged that she told Investigator Williams that the Defendant asked her and Mr. Stewart if they "wanted to get [their] licks in by hitting the [victim] with the extension cord," but she claimed that they did not do so.

Codefendant Hewlett further acknowledged that she stated to Investigator Williams that the Defendant punched the victim in the mouth, which caused the victim to fall by the bathtub; that the Defendant "tried to burn [the victim's] face on the heater vent that was in the [bathroom] floor;" and that the victim "looked at [her] and [she] motioned [the victim] toward the door trying to tell [the victim] to run." When asked why she would tell the victim to run, codefendant Hewlett responded that "it was just . . . kind of weird" throughout the day "because one minute they [were] in there talking . . . and the next minute [the Defendant was] in there doing what she was doing to [the victim], making [the victim] get naked." Codefendant Hewlett also noticed that at some point, the victim was not wearing the clothes she had on when she entered their house. Codefendant Hewlett said that because the victim had been beaten, and because the Defendant had left the residence again, she told the victim to leave for the victim's own safety.

Codefendant Hewlett confirmed that the gun was found in the Defendant's bedroom and that neither her nor Mr. Stewart stayed in that room. She asserted that she had never seen that gun or Mr. Stewart with a gun.

Codefendant Hewlett stated that she never hit the victim and that she only observed the cut across the victim's nose. She never noticed the victim's eye being swollen. Codefendant Hewlett testified that she did not do anything to stop the Defendant that day because it was "not [her] business." Codefendant Hewlett opined that her trial testimony did not contradict her police statement.

Following the conclusion of proof, the jury found the Defendant guilty as charged of aggravated assault, aggravated kidnapping, and aggravated burglary. The Defendant was found not guilty of tampering with evidence. A sentencing hearing followed, and the trial court sentenced the Defendant as a Range II, multiple offender to 10 years at 35-percent for the aggravated assault conviction, 15 years at 100-percent for the aggravated kidnapping conviction, and 10 years at 35-percent for the aggravated burglary conviction. The trial court ordered all convictions to run concurrently with each other for a total effective sentence of 15 years at 100-percent to be served in the Tennessee Department of Correction. This appeal followed.

## II.    ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence supporting her convictions for aggravated assault, aggravated kidnapping, and aggravated burglary. The State responds that the evidence was sufficient to support the Defendant's convictions.

### A.    Timeliness

As a preliminary matter, the State argues that the Defendant's appeal should be dismissed as untimely. According to the State, the trial court entered final judgments in the Defendant's case on May 11, 2021, and the Defendant did not file her motion for new trial until July 27, 2021, well beyond the 30-day deadline. The State continues that because the Defendant's motion for new trial was untimely, the 30-day deadline for the Defendant to file her notice of appeal was not tolled, and her notice of appeal was likewise untimely. The State asserts that the interest of justice does not merit this court's waiving the timely filing of the notice of appeal requirement in the Defendant's case and asks that we dismiss the appeal.

A notice of appeal must be "filed with the clerk of the appellate court within 30 days after the date of entry of the judgment appealed from." Tenn. R. App. P. 4(a). If a timely motion for new trial is filed in the trial court by the defendant, "the time for appeal for all parties shall run from entry of the order denying a new trial[.]" Tenn. R. App. P. 4(c). "A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within [30] days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). For Rule 33 purposes relative to the timely filing of a motion for new trial, "[t]he 'file-stamp' date provides evidence of when the order of sentence was entered by the clerk," and "[t]herefore, the effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge." *State v. Stephens*, 264 S.W.3d 719, 729 (Tenn. Crim. App. 2007), *abrogated on other grounds as stated in State v. Randall T. Beaty*, No. M2014-00130-CCA-R3-CD, 2016 WL 3752968, at *20 (Tenn. Crim. App. July 8, 2016).

The State contends that the trial court entered final judgments in the Defendant's case on May 11, 2021. The record reflects, however, that the trial court did not enter judgment on May 11, 2021; this was merely the date that the jury returned its verdict. The Defendant's sentence was imposed on July 19, 2021, and the uniform judgment documents, after being signed by the trial judge, were filed with the trial court clerk on July 21, 2021. Therefore, the Defendant's motion for new trial filed on July 27, 2021, was well within the 30-day filing requirement of Rule 33(b). The 30-day period for filing a notice of appeal did not commence until the trial court filed its order denying the Defendant's motion for new trial on August 18, 2021. The Defendant filed her notice of appeal document with this

court on September 16, 2021, within the 30-day deadline set forth in Rule 4. Despite the State's argument to the contrary, both the Defendant's motion for new trial and notice of appeal were timely filed. We will proceed to address her sufficiency arguments.

## B.    Sufficiency of the Evidence

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id.* (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

### 1.    Aggravated Assault

Relative to the sufficiency of the evidence supporting the Defendant's conviction for aggravated assault, the Defendant notes that there was no evidence adduced at trial placing a gun in her hands and that the only testimony regarding a weapon involved the gun Mr. Stewart was carrying when he entered the victim's side of the duplex. The Defendant concludes that because there was no evidence that she ever possessed a gun during the episode, the evidence was insufficient to support her conviction for aggravated assault based upon her display of a deadly weapon causing the victim to reasonably fear imminent bodily injury. The Defendant further contends that the evidence was insufficient to support an aggravated assault conviction based upon serious bodily injury, there being

-10-

no proof that the victim sustained injuries causing protracted or obvious disfigurement, extreme pain, loss of consciousness, permanent scarring, or broken bones requiring surgery.

The State responds that the evidence was sufficient to support the Defendant's conviction for aggravated assault, observing that the Defendant repeatedly hit the victim throughout the encounter and that, while Mr. Stewart was holding the gun, the Defendant used the presence of the gun to threaten the victim with further bodily injury. The State notes that the victim said she was "terrified" and thought that they were going to kill her. The State argues that the jury could have reasonably concluded that the Defendant intentionally caused the victim to fear imminent bodily injury with the Defendant's repeated threats and her follow through on those threats by continuously beating the victim. The State further argues that the jury could have also reasonably concluded that the Defendant used the display of a handgun to cause the victim to fear even greater bodily injury.

As pertinent to this case, a person commits aggravated assault who "[i]ntentionally or knowingly commits an assault" and the assault "[i]nvolved the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1). A person commits assault, as it relates to this case, who "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2). A "deadly weapon" includes "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 39-11-106(a)(6). "Bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(3). "Serious bodily injury" means, in pertinent part, bodily injury that involves a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. *Id*. § 39-11-106(a)(37).

Relative to the mens rea required for the offense, a person "acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a). A person "acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-302(b). Furthermore, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id.* The offense of aggravated assault contains both "nature of conduct" and "result of conduct" elements. *See State v. Szumanski Stroud*, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn.

-11-

Crim. App. Oct. 29, 2007) (stating that the victim's being placed in fear of imminent bodily injury is a "result of conduct" element while the defendant's using or displaying a deadly weapon is a "nature of conduct" element).

### a. The "Deadly Weapon" Element

In her sufficiency argument, the Defendant essentially argues that the "deadly weapon" language in the aggravated assault statute is not broad enough to proscribe her conduct in this case. The State argues that it is. Thus, although it is not denominated as such by the parties, the issue raises a question of statutory interpretation.

We must construe criminal statutes "according to the fair import of their terms, including reference to judicial decision and common law determinations, to promote justice, and effect the objectives of the criminal code." Tenn. Code Ann. § 39-11-104. The role of the judiciary is to "ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." *State v. Welch*, 595 S.W.3d 615, 621 (Tenn. 2020) (quoting *State v. Howard*, 504 S.W.3d 260, 269 (Tenn. 2016)). Legislative intent and purpose are ascertained "from the natural and ordinary meaning of the statutory language, without a forced or subtle interpretation that would limit or extend the statute's application." *State v. Blackstock*, 19 S.W.3d 200, 210 (Tenn. 2000). In construing statutes, Tennessee law provides that courts are to avoid a construction that leads to absurd results. *Welch*, 595 S.W.3d at 621 (citing *Tennessean v. Metro. Gov't of Nashville*, 485 S.W.3d 857, 872 (Tenn. 2016)). Courts are not authorized to alter or amend a statute and must "presume that the legislature says in a statute what it means and means in a statute what it says there." *Mooney v. Sneed*, 30 S.W.3d 304, 307 (Tenn. 2000) (quotations omitted).

When the language within the four corners of the statute is unambiguous, the legislative intent must be derived from the statute's face following the natural and ordinary meaning of the language used. *Davis v. Reagan*, 951 S.W.2d 766, 768 (Tenn. 1997) (citations omitted). "A statute is ambiguous when 'the parties derive different interpretations from the statutory language.'" *Welch*, 595 S.W.3d at 622 (quoting *Howard*, 504 S.W.3d at 270). Such differing interpretations must be reasonable before a statute is deemed ambiguous. *State v. Frazier*, 558 S.W.3d 145, 152 (Tenn. 2018).

> [T]his proposition does not mean that an ambiguity exists merely because the parties proffer different interpretations of a statute. A party cannot create an ambiguity by presenting a nonsensical or clearly erroneous interpretation of a statute. In other words, both interpretations must be reasonable in order for an ambiguity to exist.

*Id.* (quoting *Powers v. State*, 343 S.W.3d 36, 50 n.20 (Tenn. 2011)) (internal quotations and citation omitted). If a statute's language is ambiguous, then we may reference the broader statutory scheme, the history of the legislation, or other sources to determine the statute's meaning. *Welch*, 595 S.W.3d at 622 (citation omitted).

Turning to the plain language of the statute itself, we observe that the legislature has not defined "involved," "use," or "display," the operative terms at issue here. However, this court has determined previously that "display" as used in the aggravated assault statute means "to show; exhibit; make visible." *State v. Carter*, 681 S.W.2d 587, 589 (Tenn. Crim. App. 1984). No prior Tennessee cases have defined "involved" or "use," but decisions of other jurisdictions provide some guidance. In interpreting the federal statute prohibiting the use of a firearm during a drug-trafficking crime, the United States Supreme Court relied upon the following definitions of "to use": "[t]o convert to one's service[;]" "[t]o make use of;" "to employ;" "to avail oneself of;" "to utilize;" or "to carry out a purpose by means of." *Smith v. United States*, 508 U.S. 223, 228-29 (1993) (citing Webster's New International Dictionary 2806 (2d ed. 1939); Black's Law Dictionary 1541 (6th ed. 1990)). In interpreting the Michigan statute prohibiting the possession, placement, or use of a firearm during the operation of a methamphetamine laboratory, the Michigan Supreme Court defined "involve" as meaning "to include within itself or its scope." *People v. LaFountain*, 844 N.W.2d 5, 6 (Mich. 2014) (citing Random House Webster's College Dictionary (2005); *see also* The Merriam-Webster Dictionary (2005) ("[T]o have as part of itself: INCLUDE[.]"); Oxford English Dictionary (2d ed.) ("To include; to contain; imply.")).

As indicated, this issue turns on whether the legislature intended the language "involved the use or display of a deadly weapon" to apply to a case where the accused does not actually possess the deadly weapon. After reviewing the plain language of the statute and the parties' positions as set forth in their briefs, we cannot say that either party's interpretation is "nonsensical or clearly erroneous" as contemplated by prior decisions discussing ambiguity. We conclude that the aggravated assault statute contains an ambiguity as to whether it applies to the facts of this case. We, therefore, reference the broader statutory scheme and the history of the legislation in question to help us determine the meaning of the aggravated assault statute and to address the Defendant's argument that her purported lack of possession of the gun prevents her conviction under the statute.

A study of the history of the aggravated assault statute is instructive in determining whether the legislature intended for the statute to apply to a factual scenario such as the one at bar. Initially, we observe that the Code is replete with instances where the General Assembly has explicitly proscribed the possession of certain items or substances. The legislature certainly could have made possession of a deadly weapon an element of aggravated assault had it chose to do so. Indeed, a past version of the aggravated assault

-13-

statute did just that. *See* Tenn. Code Ann. § 39-2-101(b)(3) (Repl. 1982) (proscribing an assault "while the victim knows [the defendant] has a deadly weapon in his possession").

Then, following the 1989 amendments to the Code, aggravated assault was defined as: "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault . . . and . . . *[u]ses* a deadly weapon[.]" Tenn. Code Ann. § 39-13-102(a)(1)(B) (Supp. 1989) (emphasis added); *see* 1989 Tenn. Pub. Acts, ch. 591, § 1. A year later, in 1990, the term "display" was added to the phrase "*uses* or *displays* a deadly weapon[.]" Tenn. Code Ann. § 39-13-102(a)(1)(B) (Repl. 1991) (emphasis added); *see* 1990 Tenn. Pub. Acts, ch. 1030, § 12. After broadening the statute in 1990 to include "or displays," the legislature again broadened the statute in 2013 by enacting the language applicable to the Defendant's case: "A person commits aggravated assault who [i]ntentionally or knowingly commits an assault . . . and the assault . . . *[i]nvolved* the use or display of a deadly weapon[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A)(iii) (Repl. 2014) (emphasis added and internal punctuation omitted); *see* 2013 Tenn. Pub. Acts, ch. 461, § 2. The addition of the term "involved" to the statute is significant. We presume that the General Assembly is knowledgeable about its prior enactments and knows the state of the law at time it passes the legislation under construction. *State v. Edmundson*, 231 S.W.3d 925, 927 (Tenn. 2007). While the prior statutes first required the accused to be in possession of a deadly weapon, and later that the accused actually used or displayed the deadly weapon, the statute applicable to this case only requires that the assault *involve* the use or display of a deadly weapon.

With this legislative history in mind, we conclude that the legislature intended for the "deadly weapon" element to apply to a case such as this and further conclude that when viewing the evidence in a light most favorable to the State, a rational juror could find that the Defendant's assault upon the victim involved the use or display of a deadly weapon. During her ongoing beating of the victim, the Defendant threatened to shoot the victim if she ran. This threat occurred while Mr. Stewart was inside the victim's side of the duplex and visibly displaying a gun that could be seen by the victim. By this conduct, the Defendant involved, at least, the display of a deadly weapon as part of her assault. This conclusion is wholly consistent with the plain language of the statute and is buttressed by the historical development of the statute.

To the extent that possession has any bearing on whether this assault "involved" a deadly weapon, however, we note that a juror in this case could have reasonably concluded that the Defendant constructively possessed the gun in question. *See State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (noting that constructive possession requires that a person knowingly have "the power and the intention at a given time to exercise dominion and control over an object, either directly or through others," and includes "the ability to reduce an object to actual possession") (quoting *United States v. Craig*, 522 F.2d

29 (6th Cir. 1975); *United States v. Martinez*, 588 F.2d 495 (5th Cir. 1979)).  The Defendant demonstrated her dominion and control over the gun in this case when she warned the victim that "*they* would shoot [her]" if she tried to run.  (Emphasis added.)

This does not end the sufficiency analysis, however; the proof must also support the jury's conclusion that the Defendant possessed the requisite mens rea for this element in order for the conviction to survive a sufficiency challenge.  The required culpable mental state applies to each element of an offense.  Tenn. Code Ann. § 39-11-301(a)(1).  Therefore, the proof must demonstrate that the Defendant acted at least knowingly as it relates to the "deadly weapon" element.  As stated, the "deadly weapon" aggravator is a "nature of conduct" element.  *See Stroud*, 2007 WL 3171158, at *5.  Therefore, "with respect to the conduct or to the circumstances surrounding the conduct[,]" the proof must sufficiently demonstrate that the Defendant was "aware of the nature of the conduct or that the circumstances exist[,]" as it relates to whether this assault involved the use or display of a deadly weapon.  *See* Tenn. Code Ann. § 39-11-106(a)(23) (quoting the "nature of conduct" portion of the definition for "knowing").  In short, was the Defendant *aware* that this assault "involved the use or display of a deadly weapon?"  We conclude that a rational juror could have found that she was.

The Defendant threatened that "they" would shoot the victim while Mr. Stewart was displaying the gun inside the victim's residence.  If the gun was visible to the victim, a rational juror could infer that it was also visible to the Defendant.  The jury was not required to dismiss as mere coincidence the fact that Mr. Stewart—who, along with the Defendant, was the subject of the victim's alleged police tip—happened to enter the victim's residence, uninvited and holding a gun, in the middle of the Defendant's assault.  A rational juror could infer that this fact indicated some amount of prior collaboration between Mr. Stewart and the Defendant.  Further, according to codefendant Hewlett, the loaded gun later retrieved by the police was under the Defendant's bed.  Viewing these facts in the light most favorable to the State, a rational juror could find that the Defendant knowingly involved the display of a deadly weapon to place the victim in fear of imminent bodily injury.[2]  The evidence is sufficient to support her conviction for aggravated assault.

b.      The "Serious Bodily Injury" Element

While the Defendant also contends that the evidence was insufficient to support an aggravated assault conviction based upon serious bodily injury, we note that she was only indicted for aggravated assault based upon the use or display of deadly weapon.  In the trial transcript, the trial judge, in ruling on the Defendant's motion for judgment of acquittal, notes that the Defendant was charged with aggravated assault involving the use or display

---

[2] The Defendant does not challenge the "fear of imminent bodily injury" element.

-15-

of a deadly weapon and only addresses that mode of commission of aggravated assault. At the motion for new trial hearing, the trial judge again only addresses the use or display of a deadly weapon in discussing the Defendant's sufficiency of the evidence argument. Accordingly, we will not discuss whether the victim's injuries amounted to serious bodily injury.

2. Aggravated Kidnapping

Relative to the sufficiency of the evidence supporting the Defendant's conviction for aggravated kidnapping, the Defendant again notes that there was no evidence adduced at trial placing a gun in her hands at any time during the encounter. She further observes that once they went to the Defendant's side of the duplex, Mr. Stewart stayed in the living room the entire time and that the victim stated she never saw the gun again that day. In addition, the Defendant argues that the victim's liberty was not restricted, citing to codefendant Hewlett's testimony that the victim was intoxicated that day, that the Defendant was in and out throughout the day leaving approximately four times, and that the victim was free to leave anytime she wanted to do so, in fact doing so later that afternoon while the Defendant was gone. The Defendant also refers to the victim's testimony that while she was inside the Defendant's side of the duplex, everyone was in the living room with the exception of the Defendant and that the victim was free to get away from the Defendant out the back door of the kitchen at any time because she was never held at gunpoint. The Defendant concludes that the evidence was insufficient to sustain her aggravated kidnapping conviction based upon her substantial inference with the victim's liberty while possessing a deadly weapon or threatening the use of a deadly weapon.

The State replies that the evidence was sufficient to support the Defendant's conviction for aggravated kidnapping, observing that the Defendant kept the victim in the duplex without the victim's consent and used a gun to threaten to shoot the victim if she tried to flee. The State notes that Mr. Stewart stayed in the living room where the front door was throughout the encounter, that the victim testified she was scared of the gun and believed that she would be shot if she tried to escape, and that the victim fled out the kitchen's back door after the Defendant had left the residence for a few minutes following a phone call. The State concludes that the jury could have reasonably determined that the Defendant knowingly removed the victim from her home and confined her against her will in the Defendant's own duplex next door and that the Defendant threatened the victim with a gun to keep her from trying to escape.

As pertinent here, the Code defines aggravated kidnapping as false imprisonment "[w]hile the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon." Tenn. Code Ann. § 39-13-304(a). False imprisonment occurs when "[a] person

-16-

. . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). Even if a defendant does "not have a deadly weapon in his or her possession, but threatened the victim with the use of a deadly weapon, the offense would be punishable as an aggravated kidnapping under this section." *Id*. § 39-13-304, Sentencing Comm'n Cmnt.

### a. The "Deadly Weapon" Element

The Defendant's sufficiency argument regarding her lack of actual possession of the gun is again misplaced because the aggravated kidnapping statute only requires the threat of use of a deadly weapon. As the Sentencing Commission Comment demonstrates, the possession, or even existence, of a deadly weapon is immaterial. While the Defendant and codefendant Hewlett were assaulting the victim inside the victim's residence, Mr. Stewart walked into the residence holding a gun in his hand. The Defendant told the victim that they would shoot her if she tried to run away. The threat persisted while the victim was inside the Defendant's residence. According to the victim, once inside the Defendant's residence, Mr. Stewart stayed in the living room where the front door was throughout most of the day. The victim testified that even though she did not see the gun again once she got inside the Defendant's side of the duplex, she was scared of the gun and believed that she would be shot if she tried to escape. Moreover, a 9mm handgun was later found underneath the Defendant's bed.

### b. The "False Imprisonment" Element

Relative to the proof supporting this element, the victim testified that after the Defendant threatened to shoot her, the Defendant "jerked [her] up off the ground" by her arm, forcing her to get up, and "pull[ed]" her over to the Defendant's side of the duplex. Once inside the Defendant's side of the duplex, the Defendant ordered the victim to clean a bedroom and wash the dishes in her kitchen. The Defendant continued to hit the victim and whipped her with a heating pad cord. The victim also stated that she was terrified and that she did not feel free to leave. According to the victim, she was held against her will in the Defendant's residence for approximately 11 to 12 hours. When the Defendant took a phone call and left her residence for a few minutes, the victim fled out of the kitchen's back door, ran away from the Defendant's residence to a nearby neighbor's house, and called 9-1-1.

Nonetheless, the Defendant argues that the victim's liberty was not restricted, citing to codefendant Hewlett's testimony that the Defendant was in and out several times during the day and that the victim was free to leave anytime she wanted to do so. The Defendant also refers to the victim's testimony that while inside the Defendant's side of the duplex, everyone was in the living room with the exception of the Defendant and that she was free

to get away from the Defendant out the back door of the kitchen at any time. However, these factual issues involve questions of credibility which, in this case, were resolved by the jury in favor of the State. *See Bland*, 958 S.W.2d at 659. Questions about the credibility of a witness and the weight and value of the evidence presented at trial are issues that are resolved by the trier of fact, and this court will not reweigh or reevaluate this evidence. *Id.* (citation omitted).

Though codefendant Hewlett testified that the Defendant left several times during the day and that the victim was free to leave, the victim testified that the Defendant only left once and that during that one time, she was able to escape. Codefendant Hewlett confirmed that she told Investigator Williams that the victim "looked at [her] and [she] motioned [the victim] toward the door trying to tell [the victim] to run." At trial, codefendant Hewlett said that because the victim had been beaten and because the Defendant had left the residence again, she told the victim to leave for the victim's own safety. Moreover, the victim never testified that she was ever left unsupervised while inside the Defendant's residence, though the other individuals remained in the living room. Here, the jury heard about the victim's intoxication but, as was its prerogative, credited the victim's testimony and her version of events that she did not feel free to leave.

Based upon the evidence presented at trial, a reasonable juror could have concluded that the Defendant knowingly removed the victim from the victim's side of the duplex and confined the victim in the Defendant's side of the duplex so as to interfere substantially with the victim's liberty and that the Defendant did so while threatening the use of deadly weapon if the victim tried to escape. The proof was sufficient to support the Defendant's conviction for aggravated kidnapping.

### 3. Aggravated Burglary

Relative to the sufficiency of the evidence supporting the Defendant's aggravated burglary conviction, the Defendant asserts that she entered the victim's duplex with the victim's consent. The Defendant notes that the victim testified that the Defendant called her needing to talk and that she told the Defendant the door was unlocked, giving her permission to enter. She also notes that codefendant Hewlett testified that when she went to the victim's side of the duplex to look for the Defendant, the victim did not appear to be in distress and that both the victim and the Defendant returned to the Defendant's side of the duplex about 30 minutes later without incident. The Defendant concludes that the evidence was insufficient to support her conviction for aggravated burglary.

The State responds that the evidence was sufficient to support the Defendant's conviction for aggravated burglary, asserting that the victim's consent was invalid because it was induced by deception. The State observes that once the Defendant and codefendant

Hewlett were inside the victim's side of the duplex, the Defendant immediately took the victim's house phone and accused the victim of giving a statement to the police, and when the victim denied such, the Defendant and codefendant began punching the victim in the head. The State also notes that the victim testified that the Defendant took her house phone and her makeup bag from her duplex without her permission. The State contends that the jury could have reasonably concluded that the Defendant created a false impression of her intention by telling the victim that she wanted to come talk to her but instead entered the victim's residence for the purpose of assaulting the victim. The State concludes that a reasonable jury could have concluded that the Defendant entered the victim's residence without the victim's effective consent.

As indicted here, a person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation with intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-402(a), -403(a) (2018).[3] Because the burglary statute is silent regarding the required mens rea, the State was required to prove that the Defendant acted with intent, knowledge, or recklessness. *Id.* § 39-11-301(c). While "knowing" and "intent" have been defined above, "reckless" means that a person

> acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* §§ 39-11-106(a)(33), -302(c). "Habitation" is defined as "any structure, including buildings, module units, mobile homes, trailers, and tents, which is designed or adapted for the overnight accommodation of persons." *Id.* § 39-14-401(1)(A). An owner is a person "in lawful possession of property whether the possession is actual or constructive." *Id.* § 39-14-401(3).

"Effective consent" means "assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when . . . [i]nduced by deception or coercion." Tenn. Code Ann. § 39-11-106(a)(11). "Deception," as relevant to our analysis here, occurs when a person knowingly "[c]reates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true[.]" *Id.* § 39-11-

---

[3] The crimes of burglary and aggravated burglary are now codified at Tennessee Code Annotated sections 39-13-1002 and -1003. *See* 2021 Tenn. Pub. Acts, ch. 545, § 3 (effective July 1, 2021).

106(a)(7)(A)(i). A conviction for aggravated burglary may be permissible where a defendant affirmatively creates a false impression of his or her intent in the mind of the victim. *State v. Pope*, 427 S.W.3d 363, 373 (Tenn. 2013) (providing the hypothetical situation of a defendant "knocking on the victim's door and asking to be allowed inside in order to purchase a drink or escape the heat") (citing *Eppinger v. State*, 800 S.W.2d 652, 654 (Tex. App. 1990) (acknowledging that deception could have been found "if, for example, [the defendant] had knocked on [the victim's] door and, through the screen, asked for a cigarette")).

Here, a rational juror could have found that the Defendant engaged in an affirmative act of deception with words creating a "false impressions of fact, law, value or *intention* or other state of mind." Tenn. Code Ann. § 39-11-106(a)(7)(A)(i) (emphasis added). While the Defendant gained permission to enter the victim's residence with the seemingly benign statement "that she needed to talk," the proof demonstrates her true intent, which was to immediately begin a violent attack of the victim once inside based upon her belief that the victim had given a statement regarding the Defendant to the police. The Defendant was accompanied by codefendant Hewlett, whom the victim did not know was coming with the Defendant. The victim testified that had she known they intended to assault her, she would not have given the Defendant permission to enter her residence. While the Defendant entered the residence with the victim's consent, a rational juror could find that this consent was induced by deception because the Defendant, by her words, created a false impression of her intent upon entry. A rational juror could therefore find that the victim's consent was not effective consent as contemplated by our burglary statute. Any argument by the Defendant regarding codefendant Hewlett's testimony, wherein she stated that the victim was not in distress and that the victim voluntarily came to her side of the duplex with the Defendant, is unavailing. The jury clearly accredited the testimony of the victim over that of codefendant Hewlett, as was its province. *See Bland*, 958 S.W.2d at 659. The Defendant is not entitled to relief.

### III.   CONCLUSION

Based upon the foregoing analysis, we find the evidence sufficient to support the Defendant's convictions for aggravated assault, aggravated kidnapping, and aggravated burglary. Accordingly, the judgments of the trial court are affirmed.

_____
KYLE A. HIXSON, JUDGE